**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MARY U. MURRAY, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-06-0438 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #3). Cross-motions for summary judgment have been filed by Plaintiff Mary U. Murray ("Plaintiff," "Murray") and Defendant Michael J. Astrue[1] ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion and Memorandum for Summary Judgment ["Plaintiff's Motion"], Docket Entry #10; Defendant's Cross Motion and Memorandum for Summary Judgment ["Defendant's Motion"], Docket Entries #11, 12). Each party has also filed a response to the competing motions. (Plaintiff's Response, Docket Entry #14; Defendant's Response, Docket Entry #15). After considering the pleadings, the evidence submitted, and the applicable law, it is RECOMMENDED that Plaintiff's motion be GRANTED, that Defendant's motion be DENIED, and that this case be REMANDED with instructions to the administrative law judge ("ALJ") to develop the record further as set forth in this opinion.

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. As provided in Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Astrue is automatically substituted for Jo Anne B. Barnhart as the defendant in this action. *See* 42 U.S.C. § 405(g); *see also ACLU of Miss., Inc. v. Finch*, 638 F.2d 1336, 1340 (5th Cir. 1981).

**Background**

On August 27, 2003, Plaintiff Mary Murray filed an application for Supplemental Security Insurance ("SSI") benefits under Title XVI of the of the Social Security Act ("the Act"). (Plaintiff's Motion at 1; Transcript ["Tr."] at 12). In her application, Murray claimed that she had been unable to work since August 1, 2001, due to fibromyalgia[2] and pain resulting from an old injury to her lower back. (*See* Plaintiff's Motion at 1; Tr. at 55). On January 5, 2004, the SSA decided that Murray is not disabled under the Act, and so it denied her application for benefits. (Tr. at 26, 33). Plaintiff petitioned, unsuccessfully, for a reconsideration of that decision. (Tr. at 27, 39). She then requested a hearing before an administrative law judge. (Tr. at 40). That hearing took place on April 21, 2005, before ALJ Philip R. Kline. (Tr. at 262). Plaintiff appeared and testified at the hearing, and she was accompanied by her attorney, Luther Dulevitz. (*Id.*). The ALJ did not hear testimony from any medical or vocational expert witness.

On July 16, 2005, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1. An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

---

[2]"Fibromyalgia" is "a form of nonarticular rheumatism characterized by musculoskeletal pain, spasm and stiffness, fatigue, and severe sleep disturbance." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 632 (5th ed. 1998).

4.      If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.      If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). It is well-settled that, under this analysis, Murray has the burden to prove any disability that is relevant to the first four steps. *See Wren*, 925 F.2d at 125. If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy. *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125. "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)). An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability. *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). Under the Act, a claimant is deemed disabled only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve

months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452. A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that Murray suffers from degenerative disk disease and a history of fibromyalgia. (Tr. at 13). Although he determined that these impairments, alone and in combination, are severe, he concluded, ultimately, that they do not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations. (Tr. at 13-14). The ALJ then assessed Murray's residual functional capacity, found that she can perform "at least a light level of work activity," and then determined that, in any event, she was not precluded from a return to her previous work as a security guard. (Tr. at 20). The ALJ concluded that, because she can return to her former occupation, Murray was "not under a 'disability' as defined in the Social Security Act, at any time through the date of the decision." (*Id.*). He then denied her applications for benefits. (*Id.*).

On September 1, 2005, Plaintiff requested an Appeals Council review of the ALJ's decision. (Tr. at 8). SSA regulations provide that the Appeals Council will grant a request for a review if any

of the following circumstances is present:  "(1) there is an apparent abuse of discretion by the ALJ;

(2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported

by substantial evidence; or (4) there is a broad policy issue which may affect the public interest."

20 C.F.R. §§ 404.970 and 416.1470.  On October 18, 2005, the Appeals Council denied Plaintiff's

request, concluding that no reason for review existed under the regulations.  (Tr. at 3).  With that

ruling, the ALJ's findings became final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).  On

February 8, 2006, Plaintiff filed this lawsuit, pursuant to section 205(g) of the Act (codified as

amended at 42 U.S.C. § 405(g)), to challenge that decision.  (Plaintiff's Original Complaint

["Complaint"], Docket Entry #1).  Subsequently, the parties filed cross-motions for summary

judgment.  Having considered the pleadings, the evidence submitted, and the applicable law, it is

recommended that Plaintiff's motion for summary judgment be granted, and that Defendant's motion

be denied.  The SSA's final decision should be reversed and remanded, with instructions to the ALJ

to develop the record further with regard to Murray's fibromyalgia, carpel tunnel syndrome, and

depression.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain

whether the final decision is supported by substantial evidence and whether the proper legal

standards were applied.  *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th

Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they must be

affirmed."  *Id.* (citing *Martinez*, 64 F.3d at 173).  "Substantial evidence is such relevant evidence

as a reasonable mind might accept to support a conclusion.  It is more than a mere scintilla and less

than a preponderance."  *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d

5

at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On review, the court

does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains

substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564

(5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).   In making this

determination, the court must weigh the following four factors:  the objective medical facts; the

diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own

testimony about her pain; and Plaintiff's educational background, work history, and present age.

*See Wren*, 925 F.2d at 126.  If no credible evidentiary choices or medical findings exist that support

the Commissioner's decision, then a finding of no substantial evidence is proper.  *See Johnson*, 864

F.2d at 343.

**Discussion**

In her lawsuit, Plaintiff claims that she became disabled on August 1, 2001, due to

fibromyalgia, arthritis, an injury to her lower back, bilateral carpal tunnel syndrome, bilateral

limitation of shoulder function, and major depressive disorder. (Plaintiff's Motion at 1, 4).  She asks

this court to reverse the Commissioner's decision to deny her disability benefits, and to render a

judgment in her favor, for numerous reasons.  First, Murray claims that the ALJ erred because he

failed to find that her carpal tunnel syndrome, limitation of shoulder function, and major depressive

disorder were severe.  (*Id.* at 4).  Next, she argues that the ALJ erred by failing to analyze the

functional limitations that accompany these impairments, even if they are not severe.  (*Id.*).  In

addition, Plaintiff argues that the ALJ incorrectly found that she does not take psychotropic

medication. (*Id.* at 5).  She believes that the ALJ should have obtained medical experts on both her

physical and mental limitations.  (*Id.* at 7-10).  Further, Plaintiff argues that the ALJ erred in failing

to incorporate all of her impairments when he assessed her residual functional capacity ("RFC"). (*Id.* at 6). Plaintiff also contends that the ALJ erred by improperly evaluating her fibromyalgia and her "allegations of subjective symptoms, specifically her fatigue." (*Id.* at 9-10). Finally, she asserts that "[t]he ALJ erred in failing to give controlling weight to the substantially uncontroverted examining [physician's] RFC assessment." (*Id.* at 11). In sum, Murray argues that, because the ALJ's decision is not supported by substantial evidence and the proper legal standards were not applied, she is entitled to an award of benefits or, at the least, a remand of her case. (*Id.* at 1, 13). Defendant insists, however, that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Plaintiff is not disabled. (Defendant's Response at 6).

### *Medical Facts, Opinions, and Diagnoses*

The earliest medical record shows that, on February 29, 1996, Murray was seen by Dr. Lorraine Stehn ("Dr. Stehn"), a physician at the Medical Arts Clinic, for what appears to have been a gynecological examination. (Tr. at 227-29). Among other things, Dr. Stehn reported that Murray complained of menopausal symptoms, mood swings, neck pain, and fatigue. (Tr. at 229). On April 26, 1996, Murray returned to Dr. Stehn, complaining of arthritis that caused pain in her elbows, hand, hips, and knees. (Tr. at 230). Dr. Stehn ordered a "rheumatoid profile," and prescribed anti-inflammatory medication to treat her symptoms. (*Id.*). At a follow-up clinic appointment, another physician, Dr. Petros, reviewed the test results, and diagnosed Murray as suffering from fibromyalgia. (Tr. at 230-32). On August 4, 1997, Murray was again seen by Dr. Stehn, and, on that

7

day, she complained of "total body aches," trigger points[3] in her back, elbows, and knees, and swelling in her joints. (Tr. at 232). Dr. Stehn also reported that Murray "thinks she has chronic fatigue syndrome," and suffers from a lack of energy and insomnia. (*Id.*). Murray followed-up with Dr. Stehn on August 19, 1997, and reported that she was "sleeping better." (Tr. at 234). Murray returned to the clinic on February 9, 1998, and, on that day, complained of sinus congestion, as well as cervical muscle spasms, insomnia, depression, and mood swings. (Tr. at 235). Dr. Stehn prescribed Paxil for her symptoms of depression. (*Id.*). Later, Effexor XR was substituted because Murray reported that Paxil irritated her stomach. (*Id.*). On May 20, 1998, at her next appointment, Dr. Stehn reported that Murray was experiencing fewer muscle spasms, and less trigger point pain. (Tr. at 236). On September 1, 1998, Murray complained to Dr. Stehn that her recent separation from her husband was causing stress, and that her fibromyalgia had worsened. (Tr. at 238). She also reported that she was having trouble sleeping and had multiple trigger points. (*Id.*). Finally, on December 8, 1998, Murray returned to Dr. Stehn, complaining of "fibromyalgia pain" and swelling which was aggravated by cold temperatures. (Tr. at 239).

The next record, dated August 23, 2001, is from Dr. J. Annette Giacona ("Dr. Giacona"). (Tr. at 141). On that day, Murray sought treatment for pelvic pain and fibromyalgia, and she complained that her "heart beats fast" when she gets warm. (*Id.*). Dr. Giacona diagnosed Murray as suffering from bacterial vaginitis, fibromyalgia, and tachycardia,[4] and she prescribed medications for these conditions. (*Id.*). On December 13, 2001, Dr. Giacona performed a "well woman" exam

---

[3] The term "trigger point" refers to "a point on the body that is particularly sensitive to touch and, when stimulated, becomes the site of a painful neuralgia." *Id.* at 1653. "Neuralgia" is "an abnormal condition characterized by severe stabbing pain." *Id.* at 1098.

[4] "Tachycardia" is the name for the condition in which one's heart beats at a rate of greater than 100 beats per minute in response to a stimulus, "to increase the amount of oxygen delivered to the cells of the body." *Id.* at 1585.

on Plaintiff.  (Tr. at 140).  At that examination, Murray told Dr. Giacona that she was "feeling good" that day.  (*Id.*).  She complained, however, that bad weather made her fibromyalgia symptoms worse, and that she was experiencing fatigue.  (*Id.*).  On January 7, 2002, Murray underwent a bone density test, which revealed "early signs of the beginnings of osteoporosis."[5]  (Tr. at 130-35).  On March 20, 2002, Dr. Giacona met with Plaintiff to discuss the bone density test results, and she prescribed calcium and vitamin D supplements, as well as an aerobic exercise routine, to prevent further bone loss.  (Tr. at 129).  At that visit, Murray again complained of trouble sleeping due to pain in her left arm, which reportedly began after a tetanus shot two months earlier.  She also repeated her complaints of pain from fibromyalgia.  (*Id.*).  After her examination, Dr. Giacona prescribed pain relievers, and referred Murray to a rheumatologist.  (*Id.*).

On August 12, 2002, Murray was seen by Dr. Louis Berman ("Dr. Berman"), a rheumatologist.  (Tr. at 127-28).  Dr. Berman took note of Murray's complaint of pain in her left arm, following the tetanus shot, which had reportedly worsened so that Plaintiff now had severe pain in both arms and could not raise either of them.  (Tr. at 127).  Dr. Berman characterized this condition as "bilateral frozen shoulder with subacromial bursitis," and he recommended local steroid injections.  (Tr. at 127-28).  Dr. Berman also reported that Murray's "[c]ranial nerve and cerebellar testing is normal," as were her "[m]otor strength, sensation and reflexes" in both upper and lower extremities.  (Tr. at 127).  Following his exam, Dr. Berman made the following additional findings:

> There is no restriction in flexion, extension or rotation of the cervical, thoracic or lumbar spine.  The patient does not have any trigger points in the cervical, thoracic or lumbar spine.  Straight leg raising[6] is negative bilaterally.

---

[5] "Osteoporosis" is "a disorder characterized by abnormal loss of bone density."  *Id.* at 1169.

[6] The "straight leg raising" test is used to check for back injuries.  ATTORNEYS MEDICAL DESKBOOK 3d § 5:3.

9

(*Id.*).  Dr. Berman also examined her elbows, wrists, hands, hips, knees, ankles, and feet, but reported no abnormalities, and found that Murray's gait was normal.  (Tr. at 128).

On October 21, 2002, Plaintiff returned to Dr. Giacona, this time complaining of dizziness and nausea that would arise "in a split second" if she turned "a certain way."  (Tr. at 126). Specifically, Plaintiff reported that if she was walking and turned suddenly, she would feel "a buzz in her head," and start to feel ill.  (Tr. at 126).  Plaintiff explained that she had experienced this every few months, since at least 1989, but that it now occurred every two weeks, at a minimum.  (*Id.*).  Dr. Giacona diagnosed Murray as suffering from dizziness, headaches, and earaches, and she referred her to both an ear, nose, and throat specialist ("ENT") and a neurologist.  (*Id.*).  On October 29, 2002, Murray was evaluated by Dr. Danny Wong, an ENT.  (Tr. at 120-21).  Dr. Wong reported that Murray appeared to be "in no apparent distress," that her cranial nerves were "grossly intact," and that her symptoms could be summed up as "dizziness with an odd sensation with tinnitus[7]."  (*Id.*). On the same day, Murray was also examined by Dr. Ricardo Pardo ("Dr. Pardo"), a neurologist.  (Tr. at 191-93).  Dr. Pardo found that Murray had a full range of motion in her neck and all four extremities with no muscle atrophy, but that she did have signs of "Raynaud's phenomenon[8] on the finger."  (Tr. at 192).  He also found that Murray's gait and coordination were normal, and his neurological examination revealed no dysarthria.[9]  (*Id.*).  Dr. Pardo determined that Murray had an

---

[7] "Tinnitus" is "a subjective noise sensation, often described as ringing, heard in one or both ears."  MOSBY'S at 1621.

[8] "Raynaud's phenomenon" refers to "intermittent attacks of ischemia of the extremities of the body."  *Id.* at 1387.  "Ischemia" is "a decreased supply of oxygenated blood to a body organ or part."  *Id.* at 876.

[9] "Dysarthria" refers to "difficult, poorly articulated speech, resulting from interference in the control over the muscles of speech."  *Id.* at 524.

inner ear disorder, bilateral carpal tunnel syndrome,[10] "[l]ower lumbar stenosis[11] with neurogenic claudication,[12]" and L5-S1 radiculopathy[13] with motor weakness and near syncope.[14]"  (Tr. at 193). On the same date, Murray had a series of x-rays taken.  (Tr. at 116-19).  An x-ray of her right hand revealed signs of "mild osteoarthritis," while an x-ray of her left wrist showed no abnormalities.  (Tr. at 117, 119).  A series of x-rays of her lumbar spine revealed a "moderate loss of [disk] height at L3-L4 and L5-S1," and "marked limitation of flexion and extension."  (Tr. at 116).  X-rays of Murray's cervical spine showed "moderate narrowing at C5-C6," and evidence of "mild muscle spasm."  (Tr. at 118).  An MRI of her cervical spine, taken just three months later, was said to be "essentially normal."  (Tr. at 152).

On January 23, 2003, Murray reported to Dr. Giacona that she had recently been "feeling pain all the time," and that her feet were "numb and tingling."  (Tr. at 111).  Dr. Giacona diagnosed her suffering from "HNP[15]/ bulging dis[k] L4/L5 L5/S1."  (*Id.*).  At another appointment, on March 31, 2003, Murray complained to Dr. Giacona that she had arthritic pain and pain in her tailbone when she sits, and that she was "very forgetful since getting older."  (Tr. at 103).  On Dr. Giacona's

---

[10] "Carpal tunnel syndrome" is "a common painful disorder of the wrist and hand, induced by compression on the median nerve between the inelastic carpal ligament and other structures within the carpal tunnel."  *Id.* at 279.

[11] "Stenosis" is "an abnormal condition characterized by the constriction or narrowing of an opening or passageway in a body structure."  *Id.* at 1539.

[12] "Claudication" refers to "cramplike pains in the calves caused by poor circulation of the blood to the leg muscles."  *Id.* at 347.

[13] "Radiculopathy" is a "[d]isorder of the spinal nerve roots."  STEDMAN'S MEDICAL DICTIONARY 503 (27th ed. 2000).

[14] A "syncope" is "a brief lapse in consciousness caused by transient cerebral hypoxia."  MOSBY'S at 1576.

[15] "HNP" presumably refers to a "herniated nucleus pulposus," also known as a "herniated disk."  *Id.* at 756. A "herniated disk" is "a rupture of the fibrocartilage surrounding an intervertebral disk, releasing the nucleus pulposus that cushions the vertebrae above and below."  *Id.*

orders, Murray underwent another bone density test, on April 2, 2003.  That test revealed "[b]orderline osteopenia of the femoral neck according to the WHO-DXA[16] criteria."  (Tr. at 94-95, 98-102).  On the same date, she had an x-ray of the tailbone, which revealed no abnormalities.  (Tr. at 96-97).  A few days later, on April 9, 2003, x-rays were taken of her right ankle, which had been sprained in a recent fall.  (Tr. at 92).  That x-ray showed "[n]o fracture, dislocation, or bony abnormality."  (*Id.*).  Because Murray's ankle continued to cause her pain, however, she underwent an MRI, which revealed intact ligaments and Achilles tendon, no acute fracture or subluxation, but "a bone contusion present within the talus."  (Tr. at 89).

On July 28, 2003, Murray had a follow-up appointment with Dr. Pardo, the neurologist.  (Tr. at 148-50).  The report of that visit is not signed, however, and so it is uncertain whether she was treated by Dr. Pardo on that day.  Further, the "report" is merely a printed form with lists of various medical conditions and accompanying symptoms.  In addition, it is not even clear that Murray was actually examined before the form was marked.  (*See id.*).  Dr. Pardo, or whomever it was that filled in the form, used a series of  "+" and "-" signs beside some, but not all, of the printed categories.[17]  (Tr. at 148).  There were, however,  "+" marks beside the following neurological characteristics: "problems with walking"; "numbness or tingling in hands or feet"; "problems with memory"; and "dizziness."  (Tr. 150).  On September 23, 2003, Murray had another appointment with Dr. Pardo, who, on that day, diagnosed her as suffering from disk tears at L4-L5 and L-5-S-1, HNP, and cervical radiculopathy.  (Tr. at 151).

---

[16] "WHO-DXA" presumably refers to diagnostic criteria promoted by the World Health Organization.  *See id.* at 1730, 1768.

[17] Without any indication of what these signs mean, however, and absent any explanation of how the findings were made, the form is of questionable probative value.

The next records on file are from the Harris County Hospital District ("HCHD"), and are dated June 2003, through December 2003.  (Tr. at 194-217).  Most of these records document Murray's requests for medication to relieve symptoms tied to her back problems, fibromyalgia, arthritis, and degenerative disk disease.  (*See id.*).  The latest record, dated December 20, 2003, concerns Murray's complaints of  a urinary tract infection and a burn on her finger.  (Tr. at 194).  On this report, Murray is noted to suffer from degenerative joint disease, and "fibromyalgia, stable".  (*Id.*).

On December 10, 2003, Plaintiff was examined by Dr. George Isaac ("Dr. Isaac"), an internist, on behalf of the state.  (Tr. at 142-46).  Following that examination, Dr. Isaac summarized Murray's own complaints, her report of daily activities, and the available medical history.  (Tr. at 142-43).  Dr. Isaac documented Murray's claim that "[s]he is able to sit for 30 minutes and stand for 30 minutes and walk half a mile and lift and carry 5 lbs to 40 feet and climb 5 steps."  (Tr. at 143).  Dr. Isaac then summarized his own findings following his examination of Plaintiff.  (*Id.*).  Dr. Isaac first noted that, although Murray appeared to be mildly depressed, she was "in no acute distress."  (*Id.*).  He found that she was "well alert and oriented and communicable," and made the following observations:

> She is able to ambulate office area without any difficulty or assistive device and at normal speed.  She is able to sit and stand up from chair without difficulty.  She is able to get on to examination table and lie down and get up without help.

(*Id.*).  Dr. Isaac then reported on the tests he performed on Murray's central nervous system, as follows:

> higher function tests are normal except for minor depression and cranial nerves are intact.  No isolated atrophy of muscles is noted and muscle mass is normal and

13

muscle strength is 5/5 in all extremities.  There is no difference in circumferential measurements of calf or thigh muscles on either side.  No weakness of muscles supplied by ulnar or radial or median nerves is noted in either hand.  No atrophy of hypothenar or thenar or interossei muscles is noted.  No sensory deficits are noted. coordination is normal.  [Deep tendon reflexes ("DTR's")] are normal in all extremities.  Babinski[18] is flexor and Rhomberg sign is normal and gait is normal.

(Tr. at 143-44).  He further remarked on Murray's condition as set out below:

shows normal mass and function of all extremities except for mild pain and tenderness in upper part of both shoulders.  Abduction of shoulders is limited to 130 degrees and extension to 20 degrees and flexion to 90 degrees.  Range of movements of rest of all joints is normal and full.  Flexion and extension of knees are full and are associated with mild crepitus[19] in both sides.  She is able to pick up a small object with fingers of either hand and is able to button her clothes.  Hand grip and pinch and grasp are normal and of good strength in both hands.  No redness of skin or elevation of temperature or puffiness or swelling or subluxation is noted in any joints.  There is mild pain and tenderness in anterior aspect of both wrists.

She is unable to bend and touch the finger to the floor.  Fingers stop about 18 inches from the floor.  Flexion of lumbar spine is limited to 70 degrees and extension to 0 degrees and lateral flexion to 5 degrees and rotations are moderately limited with pain.  She is able to squat partially and get up with help and assistance.  She is able to walk on her toes and heels for few steps and to tandem walking.  She is unable to hop.  She is able to stand on either leg alone.

Dorsalis pedis and posterior tibial pulsations are well palpable in both sides and no pedal edema is noted.  No cyanosis[20] or clubbing of fingers is noted.

Examination of spine shows moderate pain and tenderness from L2 to S1 and from C5 till T1.  There is pain and tenderness in muscles of cervical spine.  No spasm of muscles of lumbar spine is noted.  Straight leg raising test shows that she is able to raise either leg to 30 degrees actively and 40 degrees passively.  She is able to do heel to shin tests on either side well.  Range of cervical spine shows that flexion is limited to 10 degrees and extension to 5 degrees and lateral flexion to 5 degrees.

---

[18] "Babinski's" tests are performed to screen for neurological abnormalities.  *See* MOSBY'S at 161.

[19] "Crepitus," or "crepitation," is a "[n]oise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions."  STEDMAN'S at 423-24.

[20] "Cyanosis" is "a dark bluish or purplish discoloration of the skin and mucous membrane due to deficient oxygenation of the blood."  *Id.* at 441.

(Tr. at 144).  In a later section of the report, captioned "comments," Dr. Isaac stated that Murray was able to lift and carry objects of 10 pounds to 40.  (*Id.*).  However, nothing in this record shows that Dr. Isaac actually tested her ability to lift and carry.  Indeed, the only other reference to these abilities is in the part of the record documenting Plaintiff's subjective complaints.  (Tr. at 142).

On December 30, 2003, Dr. Kelvin Samaratunga ("Dr. Samaratunga"), a neurologist, made an assessment of Murray's physical residual functional capacity ("RFC"), after reviewing all of the available medical evidence.  (Tr. at 218-25).  Dr. Samaratunga noted Murray's "[history of] herniated lumbar disk," fibromyalgia, and carpal tunnel syndrome.  (Tr. at 218).  From the prior medical evaluations, he found that Murray could lift 50 pounds occasionally and 25 pounds frequently, and that she could sit, stand, or walk for six hours in an eight hour work day.  (Tr. at 219).  He also found that Murray could push or pull without any restrictions, but that she could stoop or crouch only occasionally.  (Tr. at 219-20).  Dr. Samaratunga found no evidence that Murray had any manipulative, visual, communicative, or environmental limitations.  (Tr. at 221-22).  In his report, Dr. Samaratunga commented that Murray's allegations of disability were "not fully supported by medical evidence."  (Tr. at 223).  On the final page of his report, Dr. Samaratunga made written comments on Murray's alleged limitations.  (Tr. at 225).  Regarding the "complaint of fibromyalgia," Dr. Samaratunga stated as follows:

> no difference in circumferential measurements of calf or thigh muscles on either side; no weakness of muscles supplied by ulnar or radial or median nerves as to either hand; no atrophy of hypothenar or thenar or interosseous muscles is noted; no sensory deficit is noted; coordination is normal; DTR's are normal in all extremities; Babinski's flexor and Rhomberg's sign is normal and gait is normal; mild crepitus in knees.

(*Id.*).  Regarding her lower back pain, Dr. Samaratunga commented:

> flexion of back is limited to 70° and extension to 0 degrees and lateral to 5° and
> rotations are moderately limited with pain; moderate pain and tenderness from L2
> to S1 and from C5 till T1; no spasm of muscles of lumbar spine is noted; SLK 30°
> actively and 40° passively; range of cervical spine shows that flexion is limited to
> 10° and extensions to 5° and lateral flexion to 5°; x-ray—<u>mild</u> narrowing of inter
> vertebral spine between L5 and S1.

(*Id.* (emphasis in original)).  Finally, he observed that there was no diagnosis of arthritis in any of

Murray's medical records.  (*Id.*).  Dr. Samaratunga's RFC assessment was later reviewed and

affirmed by Dr. Walter Buell ("Dr. Buell"), also an agency physician.  (Tr. at 218).

The final set of medical records submitted to the ALJ, documents Plaintiff's visits to the

Baytown Medical Clinic between February and April, 2005.  (Tr. at 243-55).  On February 23, 2005,

Murray visited the clinic to obtain medication refills.  (Tr. at 243).  While there, she complained of

pain, weakness in her legs, fatigue, and arthritis pain.  (*Id.*).  In relevant part, the clinic doctor

diagnosed Murray as suffering from fibromyalgia, which was controlled by medication, and arthritis

in her feet, neck, and back.  (*Id.*).  The next record, dated March 3, 2005, is difficult to decipher, but

it appears to concern treatment for pelvic pain and symptoms of menopause.  (Tr. at 249-50).  On

March 16, 2005, Murray went to the clinic with complaints of pain in her lower back.  (Tr. at 251).

At that time, Murray also reported that she "lives in constant pain."  (*Id.*).  The attending physician

noted that Murray had been going to physical therapy, and observed that she walked and moved

"very slowly," and did not try to flex her back.  (*Id.*).  He noted  also that her heel-to-toe walking

was "OK," and that she tested negative for straight leg raise.  (*Id.*).  Ultimately, Murray was

diagnosed as suffering from back pain and fibromyalgia.  (*Id.*).  On March 31, 2005, Murray

returned to the clinic, complaining of chronic pain and difficulty getting out of bed.  (Tr. at 252).

On April 4, 2005, a clinic physician documented Murray's complaints as follows:

> Pt c/o chronic pain, fibromyalgia.  Cannot stay [with] one doctor long enough for w/u to be completed.  States her back limits her and is very fragile.  Needs disability, cannot work.

(Tr. at 253).  The doctor observed that Murray was moving slowly, but that she "stoops to pick up handbag."  (*Id.*).  The doctor then diagnosed her as suffering from "chronic back pain," reported that she had a positive ANA,[21] and referred her to "Rheumatology."  (*Id.*).  The last records from the Baytown Medical Clinic detail Murray's treatment for severe abdominal pain and gynecological complaints.  (Tr. at 254-55).

### Educational Background, Work History, and Present Age

At the time of the hearing, Murray was 56 years of age, with an eighth-grade education.  (Tr. at 265-66).  Murray testified that her work history included jobs as a security guard, a mobile copier technician, and an attendant at a laundromat.  (Tr. at 266).

### Subjective Complaints

In her application for disability benefits, Plaintiff stated that she is unable to work because of an injury to her lower back "which only got worse as I got older from doing things that I shouldn't," and because of the pain from fibromyalgia (Tr. at 55).  Although it is unclear, it appears that she suffered the referenced back injury in 1967.  (*Id.*).  In her application, Plaintiff complained that she is always in pain, particularly in her neck, back, tailbone, wrists, hands, legs, and feet.  (*Id.* at 55, 63).  She also stated that this pain prevents her from sleeping well.  (Tr. at 63).  In an amended disability application, Murray reported that she also suffers from carpal tunnel syndrome, arthritis, and swollen feet.  (Tr. at 73).

---

[21] "ANA" is an abbreviation for "antinuclear antibodies."  MERRIAM-WEBSTER'S MEDICAL DESK DICTIONARY 34 (Rev. ed. 2002).  The presence of these antibodies "tend[s] to occur frequently in connective tissue diseases (as systemic lupus erythematosus, rheumatoid arthritis, and Sjogrens syndrome)."  *Id.* at 47.

At the hearing, Murray testified about her physical condition in detail.  She stated that she suffers from constant pain in her upper and lower back, her neck, tailbone, shoulders, and hands.  (Tr. at 266).  She added that "[i]t's hard to really do much of anything with my hands."  (Tr. at 266-67).  She told the ALJ that she has many muscle spasms, primarily in her back, legs, and feet.  (Tr. at 267).  Murray also testified that air conditioning aggravates her pain, and that she is easily fatigued.  (Tr. at 267, 270).  Plaintiff testified that she regularly experiences pain, weakness, numbness, and tingling in her hands.  (Tr. at 271, 275-76).  She testified that, on one occasion, she could not wash the dishes for a week because of the weakness in her hands.  (Tr. at 276).  Murray estimated that, usually, she can lift items that weigh as much as five pounds.  (*Id.*).  Plaintiff told the ALJ that, if she turns her head for an extended period, it causes pain and numbness.  (Tr. at 272).  She also complained of regular headaches.  (*Id.*).  Murray testified that she has to be careful about her back, because if she turns too quickly, she will feel pain, and that, every few months, she actually falls down.  (Tr. at 272-74).  She added that, when she does fall down, she cannot get up without assistance, and that she must spend the next three or four days confined to bed.  (Tr. at 274).  She also testified that, after a fall, it takes one to two weeks of rest before she can walk again without "excruciating pain."  (*Id.*).  Plaintiff testified, as well, that, in 2003, she experienced "frozen shoulders," a condition which prevented her from lifting her arms to shoulder level or reaching forward.  (*Id.*).  She stated that the frozen shoulder problem had resolved within a year, but that she nonetheless still experiences pain in moving her arms because of the fibromyalgia and arthritis.  (Tr. at 275).  In addition, Murray testified that if she "squats" down to retrieve an item from the floor, she must hold on to something, like a shopping cart, to pull herself up.  (Tr. at 278).  Murray told the ALJ that she spends, on average, at least half of the day in bed, and that, when she is not in bed,

pain prevents her from sitting or standing for more than a few minutes.  (Tr. at 276-77).  Murray also stated that she does very little housework because of her pain, and that most household chores are done by her children, with whom she lives.  (Tr. at 281-82).  Murray testified further that she does drive a car a few times a week, shops by herself once or twice a month, and goes to church three times a week.  (Tr. at 283).

Murray also testified about  her mental and emotional condition at the hearing before the ALJ.   She testified that she was diagnosed with depression, which she said is a side effect of fibromyalgia.  (Tr. at 280).  Murray testified that she takes the medications Effexor XR and amitriptyline to help her mental state, to relieve her muscle spasms and pain, and as a sleep aid. (Tr. at 280, 285).  She added that these medications make her "groggy and sleepy."  (Tr. at 286).  Murray also testified that any kind of stress tends to make her "lose focus" and makes it difficult for her to concentrate.  (Tr. at 268).  She told the ALJ that she has been forgetful over the past few years, but that the antidepressants have helped to improve her memory.  (Tr. at 270).

### The ALJ's Decision

Following the hearing, the ALJ made written findings on the evidence.  From his review of the record, he determined that Murray has degenerative disk disease and a history of fibromyalgia, and that these conditions are "severe."  (Tr. at 13).  He also found, however, that Murray does not have an impairment, or any combination of impairments, which meet, or equal in severity, the requirements of any applicable SSA Listing.  (Tr. at 13-14).  Ultimately, he concluded that Murray can resume her previous work as a security guard.  (Tr. at 20).  With that decision, he denied Murray's application for SSI benefits, which prompted her request for judicial review.  (*Id.*).

19

In this action, Murray complains that the ALJ erred because he failed to find that her carpal tunnel syndrome, her limited shoulder use, and her depression are severe impairments.  (Plaintiff's Motion at 4).   She also complains that, even if these impairments are not severe, the ALJ erred because he did not analyze the functional limitations imposed by each of them.  (*Id.*).   Further, Murray contends that the ALJ's finding that she does not take psychotropic medication was "clearly erroneous," and that error lead him to understate her impairment.[22]  (*Id.*).   Murray argues, as well, that the ALJ erred because he failed to incorporate all of her impairments when he assessed her RFC, and improperly evaluated her fibromyalgia, and her "allegations of subjective symptoms, specifically her fatigue."  (*Id.* at 9-10).   Murray argues that all of these errors could have been prevented had the ALJ reviewed the evidence properly and sought the opinions of medical experts on her physical and mental limitations before he denied her application.  (*Id.* at 7-10).   Finally, Murray claims that the ALJ erred in not giving controlling weight to the RFC assessment made by Dr. Isaac, an examining physician.  (*Id.* at 11).   For all of those reasons, Murray contends  that the ALJ's decision is not supported by substantial evidence, and that he did not apply the proper legal standards in denying her claims.  (*Id.* at 1).

It is well settled that judicial review of the ALJ's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it.  *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496).   Any conflict in the evidence is to be resolved by the ALJ, and not the court.  *See id.* A finding of "no substantial evidence" is proper only if there are no credible medical findings or

---

[22] "Psychotropic" is defined as "[a]ffecting the psyche; denoting, specifically, drugs used in the treatment of mental illnesses."  *Id.* at 1167.  The class of "psychotropic drugs" includes tranquilizers, sedatives, and antidepressants. DICTIONARY.COM UNABRIDGED (V 1.1), RANDOM HOUSE, INC., *http://dictionary.reference.com/browse/psychotropic.*

evidentiary choices that support the ALJ's decision.  *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).   However, it is also well established that, in determining whether a disability exists, an ALJ "owe[s] a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts."  *Brock*, 84 F.3d at 728 (citing *Kane*, 731 F.2d at 1219).  If he fails to do so, his decision is not supported by substantial evidence, and must be reversed if the error results in prejudice to the claimant.  *See Newton*, 209 F.3d at 456-57; *Ripley*, 67 F.3d at 557.

In her motion, Plaintiff argues that the ALJ erred because he did not find that her carpal tunnel syndrome, "frozen shoulders," and depression are severe impairments, or, at a minimum, that they impose functional limitations on her ability to return to work.  (Plaintiff's Motion at 4). However, there is no evidence that Plaintiff still suffers from "frozen shoulders."  In August 2002, Dr. Berman diagnosed her as suffering from "bilateral frozen shoulder with subacromial bursitis," which she claimed was a side effect from a tetanus shot.  (Tr. at 127-28).  Dr. Berman reported that, because of this condition, Murray was unable to lift her arms without severe pain.  (*Id.*).  By December 2003, however,  Dr. Isaac found that Murray suffered only a  limited range of motion in both shoulders, and "mild pain and tenderness in upper part of both shoulders."  (Tr. at 144).  In addition, at the hearing, Murray herself testified that her "frozen shoulders" had resolved within a year, and she told the ALJ  that the pain she experiences in her shoulders and arms is due to fibromyalgia and arthritis.  (Tr at 274-75).  It appears then, that her complaints of shoulder pain do not suggest a separate impairment.  Under these circumstances, there is no merit to the argument that the ALJ erred with regard to her alleged  "frozen shoulders" impairment.

On the other hand, it is well documented that Murray still suffers from carpal tunnel syndrome.  Both Dr. Pardo and Dr. Samaratunga reported the clinical findings that lead to the diagnosis of carpal tunnel syndrome.  (Tr. at 193, 218).  But the ALJ, in his findings, dismissed Murray's claim that she was significantly limited by that condition because of other evidence showing that she had a bilateral grip strength of 5/5, that she could pick up small objects, and that her ability to grip, pinch, and grasp were otherwise normal.  (Tr. at 18).  At the hearing, Murray testified that she has significant difficulty when she uses her hands in a repetitive manner, and it is true that carpal tunnel syndrome is characterized by an increase in symptoms following repetitive motion. (Tr. at 271, 275-76).  *See* MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 279 (5th ed. 1998).  Murray stated that she regularly experiences pain, tingling, and numbness in her hands, which prevents her from doing routine activities such as washing dishes.  (*Id.*).  On this record,  the true extent of Murray's limitations from carpal tunnel syndrome  is unclear.  Because the record does not hold sufficient evidence on the degree to which Murray's carpal tunnel syndrome limits her abilities, the ALJ could not have made an accurate assessment of her RFC.  The ALJ might have avoided this finding if he had requested clarification from examining and consulting doctors, ordered another medical examination, or obtained the advice of an expert with knowledge in this area. *See* 20 C.F.R. § 416.919p; *Newton*, 209 F.3d at 453; *Brock*, 84 F.3d at 728 (citing *Kane*, 731 F.2d at 1219).  Unfortunately, he did none of those things.  Here, then, the record was not developed sufficiently on the limiting effect, if any, of Murray's carpal tunnel syndrome.

Likewise, there is significant evidence that Murray suffers from depression.  (*See* Tr. at 143-44, 235).  There is also ample evidence that Murray had been repeatedly prescribed antidepressant medications.  And, contrary to the ALJ's finding, at the time of the hearing she was still taking those

medications.  (Tr. at 141, 235, 240, 280, 285).  Indeed, the record is clear that Murray has been taking antidepressants, such as amitriptyline and Effexor, for some time.  (*See id.*).  At the hearing, she testified that her depression was a symptom of fibromyalgia, and that the antidepressants helped her not only with the depression, but also with her pain and insomnia, as well.  (Tr. at 280, 285).  The record is unclear, however, on the primary reason for the antidepressant prescriptions.  In fact, there are no records that discuss, in any depth, Murray's mental condition, or the limitations it imposes on her, if any.  In addition, a mental RFC assessment was never performed.  Further, the ALJ did not seek the opinion of a mental health expert, despite the evidence that Murray suffers from depression.  Under such circumstances, it is appropriate for the ALJ to obtain clarification from the prescribing doctors on the reason for prescribed medication, or, at a minimum, an objective opinion from a mental health expert on her mental condition.  *See Newton*, 209 F.3d at 453, 457; *Brock*, 84 F.3d at 728 (citing *Kane*, 731 F.2d at 1219).  For these reasons, the record was not developed sufficiently on Murray's depression, so the ALJ erred on this issue, as well.

Murray also contends that the ALJ improperly evaluated her fibromyalgia, as well as her "allegations of subjective symptoms, specifically her fatigue."  (*Id.* at 9-10).  Fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue."  *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004).  Common symptoms include "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease."  *Id.* at 589-90 (citing *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n.1 (8th Cir. 2003)).

> It has been recognized that the cause of fibromyalgia, is unknown, there is no cure, and it is poorly-understood within much of the medical community.  The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms.  The American College of Rheumatology issued a set of agreed-upon diagnostic criteria in 1990, but to date there are no laboratory tests to confirm the diagnosis.

*Id.* at 590 (citing *Jordan v. Northrop Grumman Corp.*, 370 F.3d 869, 872 (9th Cir. 2004); *Brosnahan*, 336 F.3d at 672 n.1).   Indeed, in *Benecke*, the court held that the "ALJ erred by 'effectively requir[ing] "objective" evidence for a disease that eludes such measurement.'"   *Id.* at 594 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003)).   Here, the record is replete with evidence that Murray has been diagnosed as suffering from fibromyalgia, as well as many of its common symptoms, and that she has been treated for that condition on a regular basis. (*See* Tr. at 141, 194-217, 218, 230-32, 238, 243, 249-50, 253).   In his decision, the ALJ stated that the record "fail[s] to demonstrate any significant neurological or sensory deficits," that accompany disability due to fibromyalgia.   (Tr. at 14).   However, the October 2002 report from Dr. Giacona, who examined Murray on several occasions, shows that Plaintiff had some neurological problems, particularly the tendency to get dizzy when she turned too fast.   (Tr. at 126).   Dr. Giacona referred Plaintiff to Dr. Pardo, a neurologist, who then diagnosed her as suffering from "[l]ower lumbar stenosis with neurogenic claudication" and "radiculopathy with motor weakness."   (Tr. at 151, 193). In addition, a July 2003 report from Dr. Pardo, or his associate, while unclear, appears to show that Murray exhibited several neurological problems, including "problems with walking," "numbness or tingling in hands or feet," "problems with memory," and "dizziness."   (Tr. 150).   Finally, a medical record from April 2005, refers to "a positive ANA," which is a common finding in persons with rheumatic disorders.   (Tr. at 253; *see supra*, n.21).   The ALJ did not explain the reason that he dismissed these findings.   In fact, he did not even address the positive ANA finding or the July 2003 neurological report.   Further, the most recent RFC was performed in 2003, but the record shows that Murray's symptoms have continued to worsen since that period.   For these reasons, and in light of the fact that fibromyalgia "is poorly-understood within much of the medical community," a more recent RFC assessment or expert opinion is warranted before a disability application can be properly denied.   *Benecke*, 379 F.3d at 589-90; *see Brock*, 84 F.3d at 728 (citing *Kane*, 731 F.2d at 1219).

In particular, given the insufficiency of the evidence before him, it would been prudent for the ALJ to invite expert witnesses to testify at the hearing as to Murray's abilities.  Unfortunately, here, not one expert witness testified at the hearing.

Finally, Plaintiff asserts that the ALJ erred because he did not give controlling weight to the "RFC assessment" made by Dr. Isaac, an examining physician.  (*Id.* at 11).  In his decision, the ALJ discredited this report because "Dr. Isaac did not provide a definitive assessment of the claimant's ability to function in [sic] a day to day basis for a sustained period of time."  (Tr. at 16).  As Defendant points out, however, it is entirely possible that Dr. Isaac was simply repeating Murray's own subjective complaints, rather than what he observed during her visit.  (Defendant's Response at 4-5).  Nevertheless, if Dr. Isaac had, in fact, performed an RFC assessment, his finding would clearly be relevant.  Because this case should be remanded for further development, the ALJ should seek clarification from Dr. Isaac, or any other physician, on what Plaintiff's RFC actually and is, and whether it will allow her to return to her former employment.

For the reasons detailed above, further evidence is necessary to permit an accurate assessment of Murray's actual physical and mental limitations.  As the Fifth Circuit has explained, "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required."  *Newton*, 209 F.3d at 459 (quoting *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981)).  "If prejudice results from the violation, the result cannot stand."  *Id.*   Clearly, Murray's rights were affected because the ALJ abrogated his duty to develop the record fully as to her physical and mental state.  *See* 20 C.F.R. § 404.1545(a) (1986).  For that reason, it is appropriate to remand her claim so that the ALJ can develop the record further on the limiting effects, if any, of Plaintiff's carpal tunnel syndrome, depression, and fibromyalgia.  It is therefore recommended that this matter be remanded, under

sentence four of 42 U.S.C. 409(g), so that the record can be developed fully, and to allow the ALJ to render a decision that is supported by substantial evidence.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, and that Defendant's Motion for Summary Judgment be **DENIED**.  It is further **RECOMMENDED** that Plaintiff's claim be **REMANDED**, so that the record can be further developed on the severity of her physical and mental impairments.  Additional evidence must include clarifications from the examining doctors on Murray's actual limitations, if any, consistent with this opinion.

The Clerk of the Court shall send copies of the Memorandum and Recommendation to the respective parties, who will then have ten business days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 02-13, S.D. Texas.  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 6th day of March, 2007.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**